**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MCNP, LLC, as assignee of Metropolitan Capital Bank & Trust, an Illinois state chartered bank, | ) | |
| Plaintiff, | ) | |
| v. | ) | 25 C 01170 |
| KEITH BARKET, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This action, initiated by Metropolitan Capital Bank & Trust (the "Bank"), arises out of an alleged breach of a written Guaranty signed by Defendant Keith Barket ("Barket" or "Guarantor"), in which he "unconditionally guarantie[d] the full and timely payment" of the liabilities of Wellstel, LLC ("Wellstel" or "Borrower") under a note in the amount of $4,000,000. It is undisputed that Wellstel defaulted under the note and Barket did not make payment under the Guaranty.

Before the Court are the parties' cross-motions for summary judgment. Both sides take the position that the Guaranty is clear and unambiguous, yet they arrive at conflicting conclusions with respect to the Guaranty's term and Barket's liability for the amounts due and owing under the note. The motions make clear that the parties have vastly different takes on the proper interpretation of the Guaranty and associated

loan documents. For the reasons explained below, the Bank's motion is granted and Barket's cross-motion is denied.

## BACKGROUND

The following facts are taken from the record and are undisputed unless otherwise noted.

***The Loan***

As of April 30, 2018, the Bank, Borrower, and two other guarantors, CP Wellstel, LLC,[1] and Solomon Barket (also, "Borrower"),[2] entered into a Loan and Security Agreement ("Loan Agreement") under which the Bank loaned Borrower $4,000,000 subject to express repayment terms and obligations ("Loan").

To evidence its obligation to repay the Loan, as of April 30, 2018, Borrower executed Term Note A ("Note") in the principal amount of $4,000,000. The Note stated that the principal portion of the Loan shall be due and payable in full on or before the "Term Loan A Maturity Date," which the Loan Agreement defined as July 30, 2019. The Note further provided that "[i]nterest on the principal of this Note shall be payable by Borrower to Lender in arrears for the prior calendar month on the first day of each following month . . . at an per annum interest rate equal to the 'Prime Rate'[3]

[1] CP Wellstel, LLC is the Manager of Wellstel, LLC.

[2] Solomon Barket ("Sol Barket") is Barket's son.

[3] The Note defines "Prime Rate" to "mean the floating per annum rate of interest most recently announced by the Wall Street Journal as its prime or base rate."

plus the 'Prime Rate Margin',[4] but in no event lower than an interest rate floor equal to eight and one half of one percent (8.5%), until the date such Loan is paid in full, . . ." Dkt. # 77, ¶ 5.

Borrower defaulted under the Loan Agreement by failing to meet the Loan Agreement's liquidity requirements. Notwithstanding that default, between March 4, 2020, and March 28, 2022, the Bank and Borrower entered into a series of written modifications[5] of the Loan Agreement and Note which, collectively, extended the Term Loan A Maturity Date to May 24, 2022, and confirmed Borrower's covenant defaults.

***The Guaranty***

As of June 17, 2022, but effective as of May 24, 2022, Lender, Borrower, and Barket, among other parties, entered into a Sixth Modification of Loan Documents ("Sixth Modification"). The Sixth Modification extended the Term Loan A Maturity Date to August 24, 2022, and amended the definition of "Guarantor" to include Keith Barket. Dkt. # 77, ¶ 11. It was signed by three Guarantors: Barket, Sol Barket individually, and Sol Barket on behalf of CP Wellstel, LLC. The Sixth Modification also defined the term "Loan Agreement" to mean the original Loan Agreement and the First through Sixth Modifications "as amended, renewed, or restated from time to time." *Id.*

In Section 6 of the Sixth Modification, the Bank, Borrower, and Barket, among

[4] The Note defines "Prime Rate Margin" to "mean two hundred (200) basis points."

[5] The First, Second, Third, Fourth, and Fifth Modifications.

others, agreed that "[a]s consideration for the financial accommodations made pursuant to this Agreement, concurrent with the execution and delivery of this Agreement, Keith Barket has executed and delivered to Lender that certain Guaranty dated as of June 17, 2022, but effective as of the Effective Date," i.e., May 24, 2022. *Id.* ¶ 12. Section 15(b) of the Sixth Modification provides, among other things, that "[e]ach of the parties to this Agreement represents that it has been advised by its respective counsel of the legal and practical effect of this Agreement, and recognizes that it is executing and delivering this Agreement, intending to be legal bound by the terms and provisions thereof, . . ." *Id.* ¶ 13. In this same Section, the parties agreed that "they have read and understand this Agreement, [and] that they intend to be legally bound by it . . . ." *Id.*

Barket executed and delivered the Guaranty in which he was defined as a "Guarantor." In his Guaranty, Barket acknowledged and agreed that "(i) Guarantor has a financial interest in Borrower . . . ." Dkt. # 66-13, § 1.D. In Section 3.A of the Guaranty, Barket "unconditionally guarantie[d] the full and timely payment and performance of Borrower's Liabilities when due or declared due, whether by acceleration, maturity or otherwise . . . ." *Id.* § 3.A. In Section 3.B, Barket further agreed that "[t]his Guaranty and the full and timely payment of Borrower's Liabilities by Guarantor pursuant to this Guaranty shall be a continuing, absolute and unconditional guaranty of payment and not of collection . . . irrespective of any other fact, event, act, omission or circumstance which might otherwise constitute a legal or

equitable discharge of liability or performance by Guarantor." *Id.* § 3.B.

Under Section 4.A of the Guaranty, Barket agreed that "Lender shall have the exclusive right from time to time without impairing, restricting, diminishing or affecting any of Guarantor's Liabilities, and ***without notice*** of any kind to Guarantor, to . . . renew, extend, accelerate, ***modify*** or otherwise change the terms of any of Borrower's Liabilities, or any instrument, agreement or document between Lender and Borrower[.]" *Id.* § 4.A (emphases added). Furthermore, "Nothing contained in this Guaranty, except the full and timely performance and payment of Borrower's Liabilities to Lender, shall operate to discharge any of Guarantor's Liabilities." *Id.*

Barket contends that the Guaranty was limited "for the period of the 90-day extension." Dkt. # 84, ¶ 2. The Bank, on the other hand, asserts that "[c]onsistent with its 'continuing' nature, the Guaranty did not contain an expiration date." Dkt. # 35, at 6. Barket testified that both he and Sol Barket advised the Bank that any guaranty Barket signed would only be effective for the 90-day period ending on August 24, 2022, and the Bank agreed to those terms. The Bank denies this allegation.[6]

Section 8 of the Guaranty, entitled "Term of Guaranty," provided that "This Guaranty and Guarantor's Liabilities shall apply to all transactions between any of the Obligors and Lender under the Loan Agreement." Dkt. # 66-13, § 8. Section 8 also set forth how Barket could terminate his liability for any indebtedness Wellstel incurred

[6] And argues that, even if the allegation were true, the allegation is not material to the pending motions because of the Court's rulings on affirmative defenses and counterclaims.

after an effective termination:

> This Guaranty may only be terminated by Guarantor giving seven (7) days advance notice of such termination to Lender in accordance with Paragraph 9 hereof. Such notice of termination, however, shall not release or affect any of Guarantor's Liabilities existing as of the effective date of such termination.

*Id.*

Section 9 of the Guaranty required any notice of termination to be "in writing and shall be deemed effective upon personal delivery, upon confirmed facsimile transmission, upon receipted delivery by overnight carrier, or three (3) days after mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, to . . . Lender" at the Bank's business address with a copy to the Bank's counsel, Thompson Coburn. *Id.* § 9.

Before the Borrower's August 24, 2024 default on the Loan by failing to pay the Loan on maturity, Barket did not send written notice of the termination of his Guaranty (a) to the Bank by "personal delivery, upon confirmed facsimile transmission, upon receipted delivery by overnight carrier, or three (3) days after mailing if mailed by registered or certified mail, return receipt requested, postage prepaid;" or (b) to Thompson Coburn. Dkt. # 77, ¶ 21. Instead, on January 18, 2023, Barket sent the Bank an email that stated as follows:

> I cannot continue our arrangement any longer.
>
> I originally stated I would agree to a short-term of 90 days, until Sol [Barket] could secure a construction loan. Then, I extended for another 90 days which has expired.

> I did tell you I would help with a new equity fund participation of one million dollars, assuming the current loan would be paid off in full of the construction loan.

*Id.* ¶ 22.[7] Thompson Coburn was not copied on Barket's email. Even so, Barket believes that the email constituted "personal delivery" of his termination notice. The Bank did not respond to the email, although the Bank's Director and Vice President, Richard Keneman, testified that he forwarded Barket's January 18, 2023 email to Michael Rose, the Bank's then-Chief Executive Officer.

***Additional Modifications***

Between September 9, 2022, and July 26, 2024, Lender and Borrower, among others, executed several additional written amendments and renewals of the Loan, which, collectively, extended the Term Loan A Maturity Date to August 24, 2024.[8]

[7] Throughout his briefing, Barket refers to a January 25, 2023 email to Richard Keneman, the Bank's Director and Vice President, but there is no such email in the record. In his Statement of Additional Material Facts, Barket cites to page 33 of Keneman's deposition. But page 33 refers to the January 18, 2023 email and a January 23, 2023 email to Keneman attaching an undated letter.

[8] The Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Modifications. The First through Fifteenth Modifications all contained a "Reaffirmation of Guarantor" provision which states, "Each Guarantor hereby ratifies and affirms their respective Guaranties and agrees that such Guaranty is in full force and effect following the execution and delivery of this Agreement. The representations and warranties of each Guarantor in the Guaranties are, as of the date hereof, true and correct and each Guarantor knows of no default thereunder. The Guaranties continue to be the valid and binding obligations of Guarantors, enforceable in accordance with their terms and no Guarantor has any claims or defenses to the enforcement of the rights and remedies of Lender hereunder." Dkt. # 66-7; ¶ 11; Dkt. # 66-8, ¶ 12; Dkt. # 66-9, ¶ 14; Dkt. # 66-10, ¶ 11; Dkt. # 66-11, ¶ 11; Dkt. # 66-12, ¶ 12; Dkt. # 66-15, ¶ 10; Dkt. # 66-16, ¶ 10; Dkt. # 66-17, ¶ 10; Dkt. # 66-18; ¶ 10; Dkt. # 66-19, ¶ 10; Dkt. # 66-20, ¶ 10; Dkt. # 66-21; ¶ 10; Dkt. # 66-22, ¶ 10; Dkt. # 66-23; ¶ 10.

Through the Seventh Modification, the Term A Maturity Date was extended through November 24, 2022. Barket avers that Keneman asked him to extend his guaranty for another 90 days through November 24, 2022, and Barket refused the requested extension. The Bank denies Keneman made such a request.

The Seventh Modification, executed on September 14, 2022, and the Eighth Modification, executed on December 20, 2022, were not signed by Barket even though there was a signature block with his name provided under "GUARANTOR ACKNOWLEDGEMENTS." Dkt. # 66-15, at 11. The Ninth through Fifteenth Modifications did not contain a signature block for Barket's signature. Only Sol Barket signed the Seventh through Fifteenth Modifications, both individually and on behalf of CP Wellstel, LLC. The Bank never asked Barket to execute the subsequent Modifications as co-guarantor. The Modifications were prepared by outside counsel.

Keneman testified that he did not require Barket's signature on the Seventh Modification (or any of the subsequent Modifications, for that matter) because the Bank already had the signed continuing Guaranty. The Bank did not send the Seventh Modification (or any of the subsequent Modifications) to Barket. In responding to Barket's statement of additional facts, the Bank stated that "consistent with the parties' prior practice, the Bank sent the Seventh Modification to Soloman Barket for his execution and for delivery to his father for his execution." Dkt. # 84, ¶ 14. The Bank claims the same with respect to the Eighth Modification. *Id.* ¶ 16.

***Borrower's Default***

Upon the Note's maturity on August 24, 2024, Borrower committed another default by failing to pay the Loan. On November 4, 2024, Barket sent the Bank a letter reiterating his position that the guaranties "have always been temporary guaranties, expiring initially as of August 24, 2022, and later as of November 24, 2022, and as such, have fully terminated and are of no further force and effect."[9] Dkt. # 66-24, at 2. The letter further stated:

> Nevertheless, by way of this correspondence, as provided under Section 8 of the Sol Guaranty and Section 8 of the Wellstell Guaranty, effective as of the date hereof, **notice is hereby provided that the Sol Guaranty and the Wellstell Guaranty, and all respective obligations, debts, responsibilities and liabilities thereunder, including but not limited to the Guarantor's Liabilities, are hereby terminated and revoked in accordance with Sections 8 and 9 of the Sol Guaranty and Wellstell Guaranty.**

*Id.* at 3 (emphasis in original). Thompson Coburn was copied on the letter.

On November 8, 2024, Thompson Coburn sent Borrower and Barket a letter notifying them that Borrower had defaulted on the Loan by, among other things, failing to pay the Loan upon its maturity—on August 24, 2024.

On December 17, 2024, the Bank's lead counsel, Saiber LLC, sent Borrower and

[9] Barket states that after the loan matured in August 2024, Keneman advised Barket that his Guaranty extended for the life of the loan, not for the 90-day period from May 24, 2022, through August 24, 2022, and this was the first such notification to Barket that it was the Bank's position that the Guaranty extended beyond August 2022. The Bank denies this, pointing to the Guaranty's language that Barket's liability thereunder was "continuing" and that nothing "except the full and timely performance and payment of Borrower's Liabilities to Lender, shall operate to discharge any of Guarantor's Liabilities." Dkt. # 66-13, § 4.A.

Barket, among others, a letter reiterating that the Borrower had defaulted on the Loan, listing the numerous events of default, including the failure to pay the Loan on its maturity, and demanding that Borrower and Barket, among others, pay all amounts due and owing to the Bank on or before the close of business on December 27, 2024. The Bank did not receive payment of the Loan on December 27, 2024, or any date thereafter.

***Sale of the Loan***

As of September 18, 2025, the Bank and Plaintiff MCNP LLC ("MCNP") entered into a Loan Sale Agreement under which MCNP agreed to purchase, and the Bank agreed to sell and assign, all of the Bank's right, title, and interest in the Loan Documents.[10] The Loan Sale Agreement further provided that the Bank would service the Loans on behalf of MCNP. MCNP purchased the Loan.

As of September 26, 2025, the Bank and MCNP entered into a First Amendment to Loan Sale Agreement under which MCNP agreed that the Bank, as servicer, would continue to cause the prosecution of this action but would not have any discretion over the course of the litigation and would follow MCNP's directions.

***Amounts Due and Owing***

MCNP asserts that the total amount due and owing from Barket is the sum of

[10] The Loan Sale Agreement defined "Loan Documents" to include, among other documents and instruments, the Note and Loan Agreement, and all amendments thereto, and the Guaranty.

$5,001,615.55 as of December 1, 2025.[11] This sum reflects the outstanding principal ($4,000,000), interest ($779,804.91), late fees ($31,598.58), modification fees ($60,000.01), and attorneys' fees and costs ($130,212.05). Per diem interest accrues from December 1, 2025, in the amount of $1,555.56. Barket does not dispute the accuracy of the Bank's calculations; he disputes that any amount is due and owing under the Guaranty.[12] He further disputes that the attorneys' fees and costs are reasonable and necessary.

***Procedural History***

The Bank initiated this lawsuit for breach of contract on December 31, 2024, in the Circuit Court of Cook County, Illinois. Barket removed the case to federal court on February 3, 2025. On February 28, 2025, the Bank filed a single-count amended complaint for breach of contract. Barket filed his answer, affirmative defenses, and counterclaims on March 14, 2025.

The affirmative defenses and counterclaims were each expressly based upon alleged oral agreements by the Bank to modify the Guaranty to provide that it would last only for 90 days, and after those 90 days had expired, a second alleged oral agreement under which Barket's Guaranty liability would be extinguished after an additional 90 days had passed.

---

[11] MCNP alternatively submits that if Barket's January 18, 2023 email terminated his liability for indebtedness incurred after the effective date of that notice of termination, the total amount due and owing would be $4,755,012.86.

[12] Barket also disputes that the legal fees and costs were reasonable and necessary.

The Bank moved to dismiss the counterclaims and strike the affirmative defenses, and the Court granted the Bank's motion in its entirety on July 8, 2025. The Court found that because both alleged agreements were oral agreements that contradicted the express terms of the Guaranty, the Illinois Credit Agreements Act barred any claims or affirmative defenses related in any way to those alleged oral agreements. The Court also held that Barket, in his Guaranty, waived any and all defenses to his liability under the Guaranty.

Following the Bank's sale of the loan to MCNP, MCNP filed a third amended complaint on November 24, 2025. The parties then filed cross-motions for summary judgment.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (cleaned up); *see also Bordelon v. Bd. of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016) ("Conclusory statements, not grounded in specific facts,

are not sufficient to avoid summary judgment" (cleaned up)). In evaluating a motion for summary judgment, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *see also Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) ("In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." (cleaned up)). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Tokio Marine Specialty Ins. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). The Court "cannot assume there are no undisputed facts merely because both sides filed motions for summary judgment; denial of one cross-motion does not require granting the other motion." *Wilson v. Baptiste*, 2016 WL 3878125, at *2 (N.D. Ill. 2016). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Tokio Marine*, 618 F. Supp. 3d at 795 (quoting

*Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012)).

## DISCUSSION

The Bank believes it has satisfied its prima facie case for enforcement of the Guaranty by providing proof of the original indebtedness, the debtor's default, and the Guaranty. *See Gen. Elec. Bus. Fin. Servs. v. Silverman*, 693 F. Supp. 2d 796, 799 (N.D. Ill. 2010) ("To establish a prima facie case for enforcement of a guaranty under Illinois law, plaintiff must enter proof of the original indebtedness, the debtor's default, and the guarantee." (cleaned up)). Barket disagrees, arguing the Bank has not met its burden because the Guaranty "expired by its terms before the Bank tried to enforce it" and, even if that were not the case, Barket "effectively terminated his guaranty, extinguishing his liability." Dkt. # 76, at 5.

Barket acknowledges that his Guaranty was continuing, but asserts "that fact did not prevent the parties from agreeing to a finite term that Barket's continuing obligation would exist." Dkt. # 76, at 8. Barket contends that the Guaranty was limited "for the period of the 90-day extension," expiring on August 24, 2022. Dkt. # 84, ¶ 2. The Bank, on the other hand, asserts that "[c]onsistent with its 'continuing' nature, the Guaranty did not contain an expiration date," and remained in full force and effect as of the August 2024 default. Dkt. # 35, at 6.

Again, Section 8, entitled "Term of Guaranty," states:

> *This Guaranty and Guarantor's Liabilities shall apply to all transactions between any of the Obligors and Lender under the Loan Agreement*. This Guaranty may only be terminated by Guarantor giving seven (7) days

> advance notice of such termination to Lender in accordance with Paragraph 9 hereof. Such notice of termination, however, shall not release or affect any of Guarantor's Liabilities existing as of the effective date of such termination.

Dkt. # 66-13, § 8 (emphasis added).

Barket contends that the Guaranty defines the term "Loan Agreement" as "that certain Sixth Modification of Loan Documents of even date herewith (as amended, renewed or restated from time to time, the 'Loan Agreement.')." *Id.* § 1.A. So, Barket says, that first sentence of Section 8 is important because it contains the parties' agreement that the Guaranty applies only so long as the *Sixth* Modification remains in effect or is properly amended. According to Barket, the Sixth Modification expired by its own terms on August 24, 2022, and, unless it was properly amended, Barket's Guaranty expired along with it by the agreed term of the Guaranty.

In response, the Bank points to the Guaranty's waiver provision. Under Section 4.A of the Guaranty, Barket agreed that "Lender shall have the exclusive right from time to time without impairing, restricting, diminishing or affecting any of Guarantor's Liabilities, and *without notice* of any kind to Guarantor, to . . . renew, extend, accelerate, *modify* or otherwise change the terms of any of Borrower's Liabilities, or any instrument, agreement or document between Lender and Borrower[.]" *Id.* § 4.A (emphases added). Furthermore, "Nothing contained in this Guaranty, except the full and timely performance and payment of Borrower's Liabilities to Lender, shall operate to discharge any of Guarantor's Liabilities." *Id.*

Barket argues that the Bank's reliance on this waiver language evinces its "overly broad and unreasonable interpretation of the Guaranty." Dkt. # 76, at 9 n.4. Barket says that "Plaintiff's interpretation, taken to its extreme, would mean that the Bank could have had a thousand loan modifications and ran the underlying debt to ten billion dollars without asking or even telling the guarantor." *Id.*

Even so, while it is true that "usually the obligations of a third-party guarantor are discharged when parties to a contract unilaterally effect a material change in their own relationship that also affects the potential liability of the guarantor, a guarantor is free to give prior consent to such modifications." *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 886 (7th Cir. 2005). Indeed, "[p]arties to such a guaranty contract are entitled to enforce its terms to the letter—including holding a party to its waiver of the consent to material alterations that may increase liability." *Id.* at 886–87 (citing *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1059–60 (1999)); *see also id.* at 887 n.1 ("Illinois courts have clearly and repeatedly held that a guarantor is free to waive notice or consent to material changes in a guaranty agreement, and that such waivers must be construed according to their plain terms."); *ITT Diversified Credit Corp. v. Kimmel*, 508 F. Supp. 140, 143 (N.D. Ill. 1981) (holding guarantor liable despite dramatic increase in liability because changes fit within the plain terms of waiver clause); *Wells Fargo Equip. Fin., Inc. v. PMRC Servs., LLC*, 2011 WL 635861, at *3 (N.D. Ill. 2011) (finding waiver of notice and consent where guarantor agreed that lender could "renew, extend (including extensions beyond the original term of the respective item of paper), modify

(including changes in interest or lease rates), release or discharge any obligations of" the borrower "without the consent of, or notice to, [guarantor] and without affecting or impairing the obligation of [guarantor]."). Indeed, the Seventh Circuit has "warned parties of the binding nature of these waiver clauses before." *Cincinnati Ins. Co.*, 403 F.3d at 887; *see United States v. Stump Homes Specialties Mfg.*, 905 F.2d 1117, 1120 (7th Cir. 1990) (stating that if guarantors had agreed to guaranty agreement's waiver provision "without consulting a lawyer and perhaps without even reading the agreement, that is their tough luck").

Barket's focus on whether or not he became an "Obligor" upon signing the Guaranty is misplaced and, in the Court's view, is immaterial to Barket's liability. Simply put, the plain language of the Guaranty controls the outcome here, and the factual disputes Barket attempts to create are not material. Barket's arguments do not change the material, undisputed facts: Barket voluntarily signed the Guaranty; the Guaranty was continuing; Barket agreed in Section 4.A that the Bank had the right to extend the Loan's maturity date without notice to Barket; the original indebtedness remained the same; the Guaranty provides that nothing "except the full and timely performance and payment of Borrower's Liabilities to Lender, shall operate to discharge any of Guarantor's Liabilities"; and the Loan has not been repaid.

The bottom line is that Barket is only "off the hook" if the Loan was repaid, or if he effectively terminated the Guaranty in accordance with Sections 8 and 9. Thus,

the question that must be answered is whether Barket effectively terminated the Guaranty. Barket contends that he did so via his January 18, 2023 email to Keneman.

Barket freely admits that he did not follow the termination procedures set forth in Section 9 of the Guaranty but nevertheless argues that his January 18, 2023 email was sufficient to terminate his liability. He relies on the principle that the object of a notice provision in a contract is to ensure that a party is actually informed. *See Bloom Twp. High Sch. v. Ill. Com. Comm'n*, 309 Ill. App. 3d 163, 179 (1999) ("[T]he purpose of a notice provision in either a contract or a statute is to ensure that a party is actually informed."); *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1019 (1989) ("In general, the object of notice is to inform the party notified, and if the information is obtained in any way other than formal notice, the object of notice is attained."). The Bank maintains that email is not a permissible means of notice under the Guaranty, and outside counsel was not copied on the email, so the Guaranty was not terminated.

The Bank offers no case law supporting its position or distinguishing Barket's cited case law, other to say that "[p]utting aside that none of these cases involved the failure of a sophisticated party to comply with a notice provision contained in a guaranty of a multi-million dollar loan, the holding in each of these cases is, as Barket states, 'if the intended recipient received actual notice,' non-compliance with a notice provision is not a material breach." Dkt. # 86, at 13–14. Outside counsel was an intended recipient, the Bank says, and outside counsel did not receive actual notice. Thus, Barket's cases "are factually distinguishable." *Id.* The Bank further points out that by

sending his November 4, 2024 termination notice by mail and copying outside counsel, Barket effectively conceded that his January 18, 2023 email was insufficient to terminate his liability under the Guaranty.

The Court agrees that Barket's January 18, 2023 email was insufficient. These are sophisticated parties that took the time to expressly designate the acceptable methods of delivering written notice of termination, and the Bank was entitled to demand strict compliance with the notice provision. "It is well settled that when parties agree to and insert language into a contract, the presumption is that it was done purposefully and the language employed is to be given effect." *Fidelity Nat'l Title Inc. Co. v. Westhaven Props. P'Ship*, 386 Ill. App. 3d 201, 215 (2007) ("In this case, the language of the partnership agreements clearly provides for written notice. To require less would not give effect to the parties' intent and would place a construction upon the partnership agreements that is contrary to the plain and obvious meaning of the language used."). Email was not one of the permissible methods of notice under the Guaranty, and notice to outside counsel was required.

The Court recognizes the principle cited by Barket that the object of a notice provision in a contract is to ensure that a party is actually informed. *See Bloom Twp. High Sch*, 309 Ill. App. 3d at 180. However, given the specific facts of this case and the millions of dollars at issue, there was good reason to require a copy to outside counsel. Barket has not shown that outside counsel received his email notice.

Therefore, because it is undisputed that Barket did not comply with the terms of the notice provision, he remained bound by the Guaranty.

In sum, MCNP has put forth undisputed evidence of the original indebtedness, Borrower's default, and the existence of a valid guaranty. *See Gen. Elec. Bus. Fin. Servs.*, 693 F. Supp. 2d at 799 (to establish a *prima facie* case for enforcement of a guaranty under Illinois law, a plaintiff must provide evidence of the original indebtedness, the debtor's default, and the existence of a valid guaranty). MCNP attached the Loan Agreement and Note that evidence the original $4,000,000 indebtedness plus interest and the other costs, fees, and expenses that are due and owing under the Loan. Although the maturity date under the Loan Agreement and Note was extended, the original indebtedness remained unchanged in the First through Fifteenth Modifications of Loan Documents. And because MCNP purchased the Loan and Loan Documents, MCNP, as assignee of the Bank, is entitled to recover the amounts due thereunder.

Borrower's default under the Loan Agreement and Note is established by the numerous loan amendments and modifications, the Bank's transaction history on the Loan, and Keneman's personal knowledge of Borrower's default. Barket admits that Borrower defaulted by, among other things, failing to pay the Loan on or before August 24, 2024, the maturity date of the Loan under the Fifteenth Modification.

MCNP also provided the executed continuing Guaranty, the language of which Barket conceded is unambiguous. Under the Guaranty, Barket agreed that "[t]his

Guaranty and fully and timely payment of Borrower's Liabilities by Guarantor pursuant to this Guaranty shall be a continuing, absolute and unconditional guaranty of payment . . . irrespective of any other fact, event, acts, omission or circumstance which might otherwise constitute a legal or equitable discharge of liability or performance by Guarantor." Dkt. # 66-13, § 3.B. The Guaranty set forth the only circumstance under which Barket's liability could be terminated, i.e., written notice to the Bank and its counsel delivered by specifically identified means. As established above, Barket did not successfully terminate his Guaranty prior to Borrower's August 24, 2024 default.

Because these undisputed facts establish MCNP's right to recover under the Guaranty and Barket's affirmative defenses have been stricken, MCNP is entitled to judgment against Barket. MCNP's motion for summary judgment is therefore granted and Barket's cross-motion for summary judgment is denied. All that remains for the Court to determine is how much Barket now owes.

According to the Bank, the total amount due and owing from Barket under his Guaranty is the sum of $5,001,615.55 as of December 1, 2025, which is calculated by adding the outstanding principal of $4,000,000, the total interest that has accrued from August 1, 2024 through December 1, 2025 in the amount of $779,804.91, the late fees that Borrower incurred during the Loan totaling $31,598.58, the unpaid Modification Fees of $60,000.01, and the total attorneys' fees and costs that the Bank incurred through October 31, 2025, in connection with the Loan in the amount of $130,212.05. Per diem interest accrues from December 1, 2025, in the amount of $1,555.56. Barket

does not dispute the accuracy of the Bank's calculations, although he does dispute the Bank's contention that the costs and attorney fees were reasonable and necessary.

Under Section 3.A of the Guaranty, Barket agreed "to pay all costs, expenses and fees, including, but not limited to, attorneys' fees, incurred by Lender in connection with this Guaranty, Guarantor's Liabilities or any collateral or security securing Guarantor's Liabilities." Dkt. # 66-13, § 3.A. "In determining reasonable attorney fees, Illinois courts conduct a multifactor analysis. Relevant factors include 'the skill and standing of the attorney, the nature of the case, the novelty and difficulty of the question at issue, the amount and importance of the subject matter, the degree of responsibility, the usual and customary charges and the benefits to the client.'" *Kieken v. City of Joliet*, 2023 IL App (3d) 220392, ¶ 28 (quoting *Black v. Iovino*, 219 Ill. App. 3d 378, 396 (1991)).

The Court reviewed the attorney declarations and detailed invoices submitted by the Bank's outside counsel, Saiber LLC, and local counsel, Thompson Coburn, in support of the Bank's claim for attorney fees and costs. Saiber's invoices amount to $99,108.33, billed at a reduced rate of $395.00 per hour. Saiber LLC's legal services consisted of reviewing and producing hundreds of pages of loan documents and other discovery documents, drafting demand letters, drafting pleadings and answers, preparing a privilege log, defending the Keneman deposition, and extensive, successful motion practice. To avoid duplication of effort, one attorney performed all services rendered by Saiber LLC. Counsel attests that, based on his forty years of experience,

and representation of more than a dozen banks and financial institutions, his rate is below the usual and customary rates charged for creditor rights' litigation seeking millions of dollars in compensatory damages.

Thompson Coburn's invoices amount to $31,103.72[13], with primary counsel performing work at a discounted rate of $400.00 per hour. Others from Thompson Coburn that worked on the matter billed at discounted rates between $280.00 and $630.00 per hour. Thompson Coburn's legal services consisted primarily of ensuring that documents and pleadings prepared by lead counsel conformed to Illinois federal practice and procedure, as well as drafting additional documents and pleadings for filing with the Court. Counsel attests that, based on his eleven years of experience, the rates charged are below the usual and customary rates charged in the Northern District of Illinois for similar engagements, and the rates are consistent with the nature of this matter and the level of experience of the attorneys and staff working on the case. The Court finds that the hours expended and the hourly rates requested are reasonable, especially given the history of the litigation in this matter.

## CONCLUSION

For the foregoing reasons, MCNP's motion for summary judgment [64] is granted and Barket's cross-motion for summary judgment [75] is denied. Judgment will be entered in favor of MCNP in an amount consisting of the principal amount ($4,000,000.00), the unpaid modification fees ($60,000.01); late fees ($31,598.58),

[13] This sum excludes the $6,001.00 billed for services rendered on a loan to Sol Barket.

attorneys' fees and costs ($130,212.05), and accrued interest through September 29, 2026. MCNP is ordered to submit a proposed judgment order with an updated sum for accrued interest on or before October 9, 2026. The Court will thereafter enter judgment in the updated amount.

It is so ordered.

Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Date: September 29, 2026